## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES

v.

TONY YANG

Criminal Case No.
1:23-cr-0258-SDG

## OPINION

The Court writes to further explain its sentencing of Defendant Tony Yang, who pleaded guilty to one count of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4), to time served plus 10 years of supervised release with the first 2 years served on home detention[1]. The sentence was a justified, but significant, downward variance from the United States Sentencing Guidelines, which recommend roughly 6.5 to 8 years in prison for a defendant of Yang's profile. Because "a major departure should be supported by a more significant justification than a minor one," *Gall v. United States*, 552 U.S. 38, 50 (2007), the Court gives its reasons for the below-Guidelines sentence in writing.

### I.    Offense Conduct and Guidelines Calculation.

Yang was sentenced for the following conduct: Twice in the span of 12 days, Yang bought child pornography from a stranger he met on a messaging app.[2] Both

---

[1]    Technically, Yang received a "time served" sentence that credited him for the few hours he spent in custody before he was released on bond at his initial appearance.

[2]    ECF 48, at 9.

times, Yang paid $60 for 50-odd videos, some of which he later deleted.[3] Thirty-six videos were found on Yang's iPhone when it was seized over a year later in July 2023.[4] At least one of the videos featured sadomasochistic content.[5] Several videos were of prepubescent girls as young as three or four years old.[6] This is Yang's first criminal offense.

The relevant Sentencing Guideline for this conduct is § 2G2.2, applicable to non-production offenses involving the sexual exploitation of minors, *i.e.*, the possession, receipt, transportation, or distribution of child pornography. Yang's offense level is calculated as follows:

A base level of 18 for violating 18 U.S.C. § 2252(a)(4), U.S.S.G. § 2G2.2(a)(1);

- *plus* 2 levels for material involving a prepubescent child younger than 12, U.S.S.G. § 2G2.2(b)(2);

- *plus* 4 levels for sadomasochistic content, U.S.S.G. § 2G2.2(b)(4);

- *plus* 2 levels for using an "interactive computer service," that is, a messaging app, U.S.S.G. § 2G2.2(b)(6);

- *plus* 5 levels for having the equivalent of over 600 images, using a conversion rate of 75 images for each video, U.S.S.G. § 2G2.2(b)(7);

---

[3]    *Id.*

[4]    *Id.* at 11.

[5]    *Id.*

[6]    *Id.* at 14–15.

   ▪ *minus* 3 levels for accepting responsibility, U.S.S.G. § 3E1.1 (a) and

   (b).

The parties agree that this equals an offense level of 28. The parties further agree

that Yang's 0 criminal history points puts him in criminal history category I.[7]

U.S.S.G. § 4A1.1. The resulting Guidelines range is 78–97 months. *Id.*

## II. Criticisms and Continued Relevance of U.S.S.G. § 2G2.2.

  The Guidelines range, however, does not necessarily correspond to a

reasonable sentence in any particular case. *Gall*, 552 U.S. at 50. Rather, the

reasonable sentence is based on an "individualized assessment" of the particular

facts of the case, guided by a host of factors described in 18 U.S.C. § 3553(a).[8] *Id.* In

weighing the 3553(a) factors, the Court must look at the "totality of the

circumstances," *id.* at 51, taking "every convicted person as an individual and

---

[7] ECF 50, at 3; ECF 51, at 12–13.

[8] The 3553(a) factors are "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims." *United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005).

every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue," *id.* at 52.

This task, rarely easy, has especially bedeviled federal courts in non-production child pornography cases like Yang's—a fact chronicled by the Sentencing Commission[9] itself in two special reports published in 2012[10] and 2021.[11] The 2012 report noted a concerning rise in sentencing disparities for similarly situated defendants under § 2G2.2, driven by a "steeply declining rate of within-range sentences":[12] from 83.2 percent in 2004 to 32.7 percent in 2011.[13] The 2021 report, which updated and expanded on the 2012 report with a focus on non-production offenses,[14] likewise noted "increasingly pervasive" sentencing

---

[9]   The Sentencing Commission, which promulgates the Sentencing Guidelines, also periodically publishes reports to Congress on sentencing policy as part of its responsibility to monitor, critique, and improve federal sentencing practices. *See* 28 U.S.C. § 995.

[10]  U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (Dec. 2012) [hereinafter 2012 Report] (available at https://www.ussc.gov/research/congressional-reports/2012-report-congress-federal-child-pornography-offenses) [https://perma.cc/C3KA-TAVM].

[11]  U.S. Sent'g Comm'n, *Federal Sentencing of Child Pornography: Non-Production Offenses* (June 2021) [hereinafter 2021 Report] (available at https://www.ussc.gov/research/research-reports/federal-sentencing-child-pornography-non-production-offenses) [https://perma.cc/SJ5Z-36L4].

[12]  2012 Report at 213.

[13]  *Id.* at 7.

[14]  2021 Report at 1.

disparities under § 2G2.2.[15] Highly relevant here, the Commission pointed to 119 child pornography defendants from 2019 who had the same Guidelines range under § 2G2.2 as does Yang—same base offense level, same specific offense characteristics, same reduction for acceptance of responsibility, same criminal history category—whose prison sentences ranged anywhere from 0 to 228 months.[16]

The culprit for this disparity, the Commission determined, is a growing belief that § 2G2.2 is poorly designed: that it is premised on an outdated view of technology, does not distinguish among defendants based on culpability or dangerousness, and over-punishes relative to "contact" sex offenses.[17] Nor is dissatisfaction with § 2G2.2 limited to the defense bar. Other major stakeholders in the federal criminal justice system—the Department of Justice, over two thirds of district judges, and the Commission itself—tend to agree that § 2G2.2 "is outmoded, does not make meaningful sentencing distinctions among offenders,

---

[15] *Id.* at 7.

[16] *Id.*

[17] 2012 Report at 11–13. A "contact" sex offense means any "sexually abusive, exploitative, or predatory conduct involving actual or attempted physical contact between the offender and a victim," *id.* at 174, like rape or sexual assault, *id.* at 314 n.20. "Non-contact offenses include enticing a minor to engage in sexual conduct via the Internet (e.g., 'cybersex' via a webcam), knowingly distributing child pornography to a real or perceived minor, and sexual voyeurism and exhibitionism offenses." *Id.*

and is overly severe in some cases."[18] Dissatisfaction with § 2G2.2 has motivated many stakeholders to "fashion[ ] their own sentencing schemes."[19] The results are striking. In 2019, nearly seven out of ten (67.8%) defendants sentenced under § 2G2.2 received a below-Guidelines sentence.[20] A plurality (42.2%) received a downward variance to which the government did not consent.[21] The *average* defendant received a sentence 33 months below the Guidelines minimum.[22]

Appellate courts reviewing these increasingly disparate sentences have wrestled with the extent to which § 2G2.2's well-attested flaws can reasonably justify aggressive downward variances from the Guidelines. This question is often framed (somewhat technically) as the scope of a district court's discretion, under the Supreme Court's decision in *Kimbrough v. United States*, to vary downwards from Guidelines that in the court's view systematically recommend unjust sentences. 552 U.S. 85, 101 (2007). At issue in *Kimbrough* was the infamous 100-to-1 crack-to-powder cocaine ratio established by the Anti–Drug Abuse Act of 1986.[23]

---

[18]   *Id.* at 244.

[19]   *Id.*

[20]   2021 Report at 24.

[21]   *Id.* at 23.

[22]   *Id.* at 21. *See also infra* at 36 (focusing on sentencing disparities in possession cases).

[23]   Under the 100-to-1 ratio, every gram of crack cocaine was treated as equivalent to 100 grams of powder cocaine, yielding "sentences for crack offenses three to

*Id.* at 94. The Commission quickly incorporated the 100-to-1 ratio into the crack Guidelines but, as *Kimbrough* explained, came to regret that decision: Over the following decades, the Commission published a series of reports criticizing its own crack Guidelines as resting on false factual premises and promoting unwarranted sentencing disparities. *Id.* at 97–98. In that context, *Kimbrough* held, a district judge was within his discretion to "accord[ ] weight to the Sentencing Commission's consistent and emphatic position that the crack/powder disparity is at odds with § 3553(a)," *id.* at 111, and accordingly impose below-Guidelines sentences based "solely" on policy-level disagreements with the Guidelines. *Id.* at 110.

Child pornography defendants around the country have argued that *Kimbrough*'s reasoning applies to § 2G2.2: that district courts can impose below-Guidelines sentences based on their own determination that § 2G2.2 rests on outdated factual premises and fosters sentencing disparities. The response to this argument from the Circuits—as might be expected, given the difficulty of the subject matter—has been uneven. At one end, the Second Circuit in *United States v. Dorvee* held that *Kimbrough* applied to § 2G2.2 "with full force." 616 F.3d 174, 188 (2d Cir. 2010). *Dorvee* criticized § 2G2.2 as "an eccentric Guideline of highly unusual provenance" prone to "generat[ing] unreasonable results," and

_____

six times longer than those for powder offenses involving equal amounts of drugs." *Kimbrough*, 552 U.S. at 94.

encouraged district courts to exercise the full range of their sentencing discretion in non-production child pornography cases. *Id.* At the other end, the Sixth Circuit, in *United States v. Bistline*, distinguished *Kimbrough* and held that a district court "faces a considerably more formidable task" varying from § 2G2.2 than from the crack Guidelines at issue in *Kimbrough*. 665 F.3d 758, 763 (6th Cir. 2012). *Bistline* explained that "Congress has taken an active role in crafting § 2G2.2," and has "amended [it] directly or through mandates to the Sentencing Commission." *Id.* at 761. Thus, *Bistline* reasoned, § 2G2.2 reflects the moral judgments of Congress in a way that the crack Guidelines did not and is entitled to more deference than the Supreme Court showed in *Kimbrough. Id.* at 763.

Nevertheless, though the Circuits have not spoken with one voice on district court discretion under § 2G2.2, the outlines of the following consensus rule have begun to take shape: While district judges should not assume that within-Guidelines sentences under § 2G2.2 are unreasonable *per se*, neither are they precluded from considering policy-based criticisms of § 2G2.2 to determine whether to vary downwards in a particular non-production child pornography case. *United States v. Grober*, 624 F.3d 592, 608 (3d Cir. 2010) (permitting district judges to vary downward from § 2G2.2 for policy reasons if their variances are supported by compelling explanations under the § 3553(a) factors); *accord United States v. Stone*, 575 F.3d 83, 92 (1st Cir. 2009) (authorizing variances under

*Kimbrough* based on "policy disagreements tied to the facts of a specific case"); *United States v. Pape*, 601 F.3d 743, 749 (7th Cir. 2010) (allowing judges the liberty to reject § 2G2.2 on reasonable policy grounds as applied to a particular defendant); *United States v. Black*, 670 F.3d 877, 882 (8th Cir. 2012) (assuming without deciding that district judges can vary downwards from § 2G2.2 for policy reasons); *United States v. Henderson*, 649 F.3d 955, 963–64 (9th Cir. 2011) (giving district courts the authority but not the obligation to vary from § 2G2.2 for policy reasons); *United States v. Grigsby*, 749 F.3d 908, 911 (10th Cir. 2014) (agreeing that district judges should carefully apply the child pornography guidelines and "remain mindful" of their broad sentencing discretion under § 2G2.2); *United States v. Fry*, 851 F.3d 1329, 1334 (D.C. Cir. 2017) ("[E]ven if a district court retains discretion to vary from the child-pornography Guidelines based on a policy disagreement with them, a district court does not necessarily abuse its discretion by agreeing with (and applying) those Guidelines."); *see also United States v. Strieper*, 666 F.3d 288, 296 (4th Cir. 2012) (declining to strip the rebuttable presumption of reasonableness from within-Guidelines sentences under § 2G2.2); *United States v. Miller*, 665 F.3d 114, 121 (5th Cir. 2011) (requiring district judges to consider § 2G2.2 in calculating a reasonable sentence).

This more-or-less consensus rule was the one adopted by the Eleventh Circuit in *United States v. Cubero*. 754 F.3d 888, 900 (11th Cir. 2014). Thus, on one

hand, *Cubero* affirmed the "continuing legitimacy of § 2G2.2" following the publication of the Commission's 2012 report. *Id.* As *Cubero* explained, nothing in the report changed "the statutory sentencing scheme, the applicable sentencing guidelines, or the binding precedent about § 2G2.2 in this Circuit"—Section 2G2.2, in other words, is legitimate so long as it remains on the books. *Id.* But *Cubero* also acknowledged the Commission's "serious criticism" of § 2G2.2 and, citing *Kimbrough*, explicitly empowered district judges to consider downward-variance policy arguments embodied in the 2012 report in crafting a reasonable sentence under § 3553(a).[24] *Id.; accord United States v. Irey*, 612 F.3d 1160, 1212 (11th Cir. 2010) ("*Kimbrough* allows a district court to vary from the guidelines based solely on its judgment that the policies behind the guidelines are wrong.").

In undertaking that task to determine the appropriate sentence for Yang, the Court begins with a general truth: Child pornography is a vicious crime. It is the sexual violation of society's most helpless, for profit. It normalizes the

---

[24] There is some tension on this point between *Cubero* and *United States v. Pugh*, an earlier Eleventh Circuit case that also discussed *Kimbrough*'s applicability to downward variances under § 2G2.2. 515 F.3d 1179, 1201 n.15 (11th Cir. 2008). *Pugh*, in a footnote, distinguished *Kimbrough* in part because it saw "no indication" that the non-production child pornography Guidelines "suffer[ed] from any criticisms like those *Kimbrough* identified for the crack cocaine Guidelines." *Id.* As the Court reads *Cubero*, the Eleventh Circuit recognizes that policy-based criticisms of the child pornography Guidelines have escalated enough since *Pugh* to more fully implicate *Kimbrough*.

objectification of children and inflicts "perpetual harm" on its victims.[25] The Eleventh Circuit has described it as "among the most egregious and despicable of societal and criminal offenses," *United States v. Sarras*, 575 F.3d 1191, 1220 (11th Cir. 2009); as posing "an even greater threat to the child victim than does sexual abuse or prostitution," *United States v. Pugh*, 515 F.3d 1179, 1196 (11th Cir. 2008) (quoting *New York v. Ferber*, 458 U.S. 747, 759 n.10 (1982)); and as an attack, not just on the victim, "but on her childhood," *Irey*, 612 F.3d at 1207 (quoting *Kennedy v. Louisiana*, 554 U.S. 407, 435 (2008)). The Commission's 2012 report recites the numbing details: millions of images,[26] thousands of victims, mostly girls, 76 percent of them prepubescent, 10 percent of them toddlers or infants.[27] The report tries to put the harm they suffer into words: the humiliation, self-blame, and fear of recognition that haunts them and inhibits many from ever reporting;[28] the knowledge that a record of their shame will exist forever, to be bought and sold by strangers;[29] the dread that their images might be used to groom another

---

[25]  2012 Report at vi.

[26]  Following the Commission's lead, the Court uses "images" to refer collectively to photographs and videos. *Id.* at 80.

[27]  *Id.* at 108.

[28]  *Id.* at 111.

[29]  *Id.* at 113.

generation of victims.[30] This harm inheres in *every* child pornography offense, including Yang's.[31]

That inherent harm, in the Court's view, is the most compelling justification for long sentences in non-production child pornography cases: because using child pornography validates and incentivizes child rape. Judges do not impose long sentences on non-production defendants solely because of empirically dubious beliefs about pedophiles, *i.e.*, that they have an incurable disease and must be sequestered from the general population by lengthy prison sentences.[32] Quite the contrary: Appellate opinions in non-production child pornography cases have been intently concerned, not with rehabilitation and incapacitation, but with "deterrence and desert." *United States v. Goldberg*, 491 F.3d 668, 674 (7th Cir. 2007). Their primary focus has not been on preventing what might happen, but on punishing what already has. *See, e.g.*, *United States v. Goff*, 501 F.3d 250, 260 (3d Cir. 2007) (vacating a below-Guidelines sentence for a non-production child pornography defendant because the district court "failed to give adequate weight to the severity of his offense").

---

[30]   *Id.*

[31]   *Id.* at 311.

[32]   ECF 51, at 19–20.

The Court therefore rejects Yang's suggestion that he should receive a noncustodial sentence because he was an out-of-control porn addict, as opposed to an "entrenched and unchangeable pedophile"[33] liable to "abuse or have relations with children."[34] That line of argument was forcefully foreclosed by *Pugh*, in which the Eleventh Circuit vacated a noncustodial sentence in a § 2G2.2 case notwithstanding the district court's finding that the defendant was addicted to adult pornography, "was not a pedophile[,] and presented a low risk of re-offending." 515 F.3d 1179, 1187 (11th Cir. 2008). The district court's biggest mistake in *Pugh* was the same ones Yang invites the Court to make here: neglecting the purposes of general deterrence and "just deserts" by glossing over the severity of even the lowest-level child pornography offense. *Id.* at 1195.

That is not to say that a noncustodial sentence for Yang is necessarily inconsistent with *Pugh*, which involved more lenient punishment for more culpable conduct. The punishment deemed unreasonable in *Pugh* was a five-year sentence of probation only, without the home detention or supervised release that Yang receives here. *Id.* at 1187. The defendant in *Pugh* also engaged in more aggravated conduct: he invited others to send him pornographic images by posing as a 14-year-old girl in internet chat rooms, *id.* at 1187; forwarded the images to

---

33    *Id.* at 21.

34    *Id.* at 20.

others "under the pretense that he was the subject of the pictures," *id.* at 1183; downloaded child pornography on at least 70 separate occasions over the course of several years, *id.* at 1193; gave an ambiguous statement to the FBI that could be interpreted as an admission that he was addicted to child pornography, *id.* at 1186; and had been previously accused by his grandniece of inappropriate sexual conduct, *id.* at 1185 n.3. No such circumstances are present here.

Nevertheless, in arriving at the sentence in this case the Court must give due regard to *Pugh*'s mandate that courts should not vary very far downwards from § 2G2.2 "without examining *all* of the relevant factors embodied in Section 3553(a)," *id.* at 1194 (emphasis added), taking special care that the sentence imposed "reflect the seriousness of the offense" and "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(A), (B).

## III.    3553(a) Factors.

### 1.    The history and characteristics of the defendant[35]

Yang's sentence adequately reflects his personal mitigating characteristics. Yang is, by all accounts, a shy but otherwise typical young man whose crippling

---

[35] The first two § 3553(a) factors are (1) "the nature of circumstances of the offense and the history and characteristics of the defendant," and (2) "the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." *Supra* note 8. However, as the Eleventh Circuit has recognized, the analysis tends to proceed more smoothly when these factors are reconfigured in this way. *Irey*, 612 F.3d at 1198.

pornography addiction drove him to some of the darkest images on the internet. Yang's psychological evaluation is for the most part unremarkable: It shows that Yang is intellectually average (a B-and-C student) and socially functional (though mildly inhibited and awkward), with no history of inappropriate sexual conduct, predatory behavior, or antisocial tendencies. Yang was, however, diagnosed with obsessive thinking "in relation to masturbation and pornography use," which he engaged in for hours every day despite efforts to stop.[36] Yang's pornography use—which he himself described as "a domino effect," "extreme," "out of hand," and an "addiction"—eventually led him to child pornography: Yang got bored of watching the "same old stuff," was exposed to child pornography as he browsed for "amateur, more real" content, and purchased child pornography out of a morbid interest in the obscene.[37]

Yang's pornography addition is not a mitigating sentencing factor *per se*,[38] but it is important context for factors that the Court does consider mitigating:

---

[36]   ECF 51-1, at 8.

[37]   *Id.* at 7.

[38]   Yang is not alone in turning to child pornography due to "habituation to adult pornography and an increasing need to identify new and more extreme images in order to achieve sexual arousal." 2012 Report at 78.

Yang's age, his lack of sexual interest in children, and his engagement in mental health therapy.

### i. Age

Beginning with age: The typical child pornography defendant is a 41-year-old adult.[39] Yang, at the time he committed the offense, was 21.[40] And Yang's youth, as the Guidelines now recognize, both contextualizes his criminality and is an encouraging sign for corrective change. *See* U.S.S.G. § 5H1.1; *see also Graham v. Florida*, 560 U.S. 48, 68 (2010) (explaining that younger offenders "have lessened culpability" and are "more capable of change" relative to fully developed adults).[41] Yang's psychological evaluation reported that his child pornography use was driven by "compulsion, impulsivity, curiosity, and naivety."[42] Three of these traits—impulsivity, curiosity, and naivety—are classically associated with youthful individuals, whose still-developing brains tend to be "more impulsive,

---

[39] 2021 Report at 18.

[40] ECF 51, at 21.

[41] *Graham* was a case about punishing minors under the age of 18. However, in holding that juveniles should not be subjected to the same punishment as adults, *Graham* invoked findings from "psychology and brain science" that showed "fundamental differences between juvenile and adult minds." These findings apply—though with diminished force—to young adults like Yang who are older than 18 but below the age of full maturity.

[42] ECF 51-1, at 10.

risk-seeking, and susceptible to outside influence."[43] U.S.S.G. § 5H1.1. As Yang's brain continues developing into his 20s, these three traits will tend to decrease more sharply than in the typical defendant. *Id.* The other trait—compulsion—is associated with Yang's pornography addiction, which was diagnosed as a form of obsessive-compulsive disorder.[44] And it is reasonable to believe that Yang, because of his youth, is more "amenable to rehabilitation" from his pornography addiction than is the typical defendant. *Id.* Age, in other words, is an important mitigating factor here, and a strong reason to consider the sufficiency of "a form of punishment other than imprisonment." *Id.*

### ii.    Lack of sexual interest in children

Also mitigating is the fact that Yang does not meet the diagnostic criteria for either pedophilia or child sexual paraphilia.[45] Most child pornography offenders

---

[43] *See generally*, Gail Horner, *Child and Adolescent Pornography Exposure*, 34 J. Pediatric Health Care 191 (2020) (discussing the impact of adolescent pornography exposure to behavioral and sexual development).

[44] ECF 51-1, at 8.

[45] *Id.* at 9. Yang's psychological evaluation, by reference to the Diagnostic and Statistical Manual (DSM-5), defines paraphilia as "an intense and persistent sexual interest in objects and/or nonconsenting persons that causes major impairment to the individual with the atypical sexual interest or harm to the person who is the target of the behavior." *Id.* One variety of paraphilia recognized by the DSM-5 is "sexual interest in children." *Id.*

are sexually interested in children to some degree,[46] and there appears to be a "correlation between viewing child pornography and sex offending."[47] Indeed, the severity of the child pornography statutes are in part attributable to "an underlying presumption that child pornography offenders are really undetected child molesters."[48] But Yang's psychological evaluation concluded that, outside of his underlying conduct in this case, he has no "history of sexual or nonsexual offending," has never "sought underage people online or in person," holds no "sexually deviant beliefs," and has engaged in no "sexually deviant behavior."[49] The absence here of *any* collateral conduct, admitted or alleged, indicating any sexual interest in children makes Yang an atypical defendant—more so, for example, than the defendant in *Pugh*. It also puts Yang at a particularly low level of risk to commit future sex crimes and thereby supports the imposition of a noncustodial sentence.

---

[46]  2012 Report at 77. *See also Pugh*, 515 F.3d at 1185 ("[M]ost defendants in child pornography cases are diagnosed as having Internet child pornography paraphilia.").

[47]  2012 Report at 102.

[48]  Hamilton, Melissa, *The Efficacy of Severe Child Pornography Sentencing: Empirical Validity of Political Rhetoric?*, 22 Stan. L. & Pol'y Rev. 545, 545 n1. (2011).

[49]  2012 Report at 102.

### iii.    Mental health therapy

A third mitigating factor is Yang's proactive engagement in treatment for his underlying pornography addiction. For over eight months, Yang has been attending weekly counseling sessions with a licensed therapist for sex addiction.[50] Through counseling, Yang has gained insight into "how his behavior constituted participation in the abuse of children, as well as the many ways in which his actions led to significant damage to these children's lives."[51] Yang has also been attending two separate weekly 12-step pornography addiction meetings,[52] where he has been able "to share and process his behavior fully and honestly" and develop "an even deeper level of compassion and empathy."[53] The Guidelines provide that a mental condition like Yang's can justify a more lenient sentence in unusual circumstances. U.S.S.G. § 5H1.3. And though the Court reiterates that Yang's condition is not itself unusual, the collective circumstances of Yang's treatment are: his proactivity in addressing his psychological dysfunction; his sober reckoning with the moral weight of his actions; his growing empathy for the

---

[50]    ECF 51-1, at 10.

[51]    ECF 52, at 1.

[52]    ECF 51-1, at 11.

[53]    ECF 52, at 1.

victims of childhood sexual abuse; his supportive family members and friends;[54] his desire for self-improvement;[55] and his youthful receptivity to change. This unique combination of mitigating circumstances supports the imposition of a noncustodial sentence.

### 2.   The nature and circumstances of the offense, the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense

Yang's sentence adequately reflects the seriousness of his offense, promotes respect for the law, and provides just punishment because it is proportional to the relative culpability of Yang's conduct. Relative culpability, the Court recognizes, is a hard topic in child pornography cases. On one hand, child pornography is "so odious, so obviously at odds with common decency, that there is a real risk that offenders will be subjected to indiscriminate punishment based solely on the repugnance of the crime." *Goff*, 501 F.3d at 260. On the other hand, it is also possible to "err[ ] in the opposite direction," overemphasize personal mitigation, and fail "to give adequate weight to the severity of [the] offense." *Id.* The Court

---

54   ECF 51-1, at 5; ECF 52, at 2–6 (letters of support). Family ties are ordinarily not a relevant factor in sentencing. U.S.S.G. § 5H1.6. However, nothing in the Guidelines prevents the Court from considering Yang's social support system as a positive protective factor in evaluating the collective circumstances of his mental health treatment.

55   ECF 51-1, at 10.

nevertheless believes its sentence here properly balances the limited nature of Yang's participation with the aggravated nature of his offense.

In evaluating the relatively culpability of Yang's conduct, the Court gives little weight to the specific offense characteristics in § 2G2.2, which put "disproportionate emphasis on outdated measures of culpability."[56] Most of § 2G2.2's enhancements were promulgated when "offenders typically received and distributed child pornography in printed form using the United States mail," and "graphic sexual images involving very young victims" were less easily available.[57] Since then, technological advances have fundamentally changed both the manner of distribution and the matter distributed, with "entry-level offenders" now able to access large amounts of indiscriminately explicit content at low cost and with little effort.[58] As a result, four of the § 2G2.2 enhancements—precisely the four that Yang received in this case—apply in the majority of cases, are not probative of relative culpability, and do not "meaningfully distinguish" between low-level participants and sophisticated operators.[59]

---

[56]  2021 Report at 2.

[57]  2012 Report at 313.

[58]  *Id.*

[59]  2021 Report at 19. The four enhancements apply in the following percentage of possession cases: prepubescent victims in 96.3%, sadomasochistic content in 78.6%, use of a computer in 96.3%, and 600 or more images in 77.2%. *Id.*

Instead of the § 2G2.2 enhancements, the Court looks to three factors that the Commission has reported *are* probative of culpability in non-production child pornography cases: (1) content, (2) community, and (3) conduct.[60] The first factor concerns "the *content* of the offender's child pornography collection and nature of the offender's collecting behavior"—what the offender has, how he got it, and what he does with it.[61] And though the Commission has yet to develop a systematic way to sort non-production offenders by culpability based on content, it has identified certain aggravating circumstances: images depicting toddlers and infants;[62] active solicitation of certain types of preferred images;[63] collections that are carefully organized[64] or that span multiple devices and contain thousands or even millions of images;[65] and sophisticated methods of concealment involving the dark web, file-wiping software, encryption, or cryptocurrency.[66]

---

[60]   *Id.* at 28.

[61]   *Id.* at 2 (emphasis in original). While enhancements under § 2G2.2 for the quality and quantity of images and videos do go to this factor, § 2G2.2 fails to account for how technological advances have raised the threshold for what constitutes aggravating content.

[62]   *Id.* at 31.

[63]   2012 Report at 81.

[64]   *Id.* at 82–83.

[65]   2021 Report at 34.

[66]   *Id.* at 35.

The second factor concerns "the offender's degree of involvement with other offenders, particularly in an internet *community* devoted to child pornography and child sexual exploitation."[67] The Commission reported that about two in five (43.7%)[68] non-production child pornography offenders were members of child pornography-focused "communities"—often messaging apps, social networking sites, or online chat rooms that allowed "direct communication and trading of images or videos with like-minded peers."[69] Communities range in sophistication from informal contacts between individuals who share an interest in child pornography, to exclusive password-protected groups that strictly vet prospective members.[70] Participants in these communities, of course, exchange images and videos—but they also justify and condone each other's sexualization of children, provide each other emotional support and social acceptance, promote the development of sexually deviant online personas, teach each other about technology, and even encourage the production of new child pornography, sometimes as a way to access further material or climb the community hierarchy.[71]

---

[67] *Id.* at 2.

[68] *Id.* at 38.

[69] 2012 Report at 93–94.

[70] *Id.* at 93, 95.

[71] *Id.* at 96–97.

The third factor concerns the offender's engagement in sexually abusive or exploitative *conduct* in addition to the child pornography offense.[72] Aggravating conduct under this factor encompasses both contact and non-contact sex offenses involving (real or perceived) minors, as well as contact and non-contact child pornography offenses.[73] Based on information gleaned from presentence reports and plea agreements,[74] the Commission reported that nearly half (48%) of non-production defendants had also engaged in collateral aggravating conduct,[75] while almost a third (29.3%) had committed an additional contact sex offense involving a minor.[76] In addition, among defendants convicted of possession, more than half (56.8%) had engaged in child pornography distribution,[77] and about one in 15 (6.8%) had at least attempted child pornography production.[78]

Examining Yang's offense under the Commission's three factors—content, communities, and conduct—reveals that Yang's conduct is at the lower end of

---

[72]   2021 Report at 2.

[73]   *Id.* at 40.

[74]   Because the Commission looked at each defendant's underlying conduct regardless of whether it resulted in a conviction or a sentencing enhancement, the Commission identified aggravating conduct that, in over half of cases, was not reflected in the defendant's sentence. *Id.* at 41.

[75]   *Id.*

[76]   *Id.* at 42.

[77]   *Id.* at 51.

[78]   *Id.* at 52.

relative culpability. The images Yang possessed depicting very young children and sadomasochistic content are utterly deplorable—but sadly all too common in modern child pornography cases. And Yang's content otherwise lacked the hallmarks of a more sophisticated collector: it had no thematic focus, was not organized or extensive, and was not protected or concealed. Neither was Yang part of any child pornography communities,[79] nor alleged to have committed collateral sexually offending conduct.[80]

Yang's relative culpability comes into clearer focus by comparing him to the defendant in *Pugh*. The defendant in *Pugh* participated in child pornography communities: he had a habit of entering chat rooms disguised as an underage girl, knowing that doing so would cause others to send him child pornography. *Id.* at 1183–84. Also, *Pugh* involved collateral offending conduct: The defendant had been accused of inappropriate sexual banter by his grandniece, *id.* at 1185 n.3, and admitted to distributing child pornography to others, *id.* at 1183. The Commission's three factors help explain what the Eleventh Circuit intuited in *Pugh* about the defendant's aggravated culpability.

---

[79] Yang admits to being part of adult pornography communities but clarifies that those communities only dealt with legal content. ECF 48, at 10.

[80] Yang passed a polygraph test in which he denied engaging in "hands-on" sex offenses. *Id.*

This is in addition to the fact that Yang's conduct is on the low end of culpability under more standard measures. Unlike in *Pugh*, for example, Yang's transactions were limited in time and number (twice over the course of two weeks, as opposed to at least 70 times over the course of several years). *Id.* at 1193. Also, unlike *Pugh*, Yang has not only accepted responsibility for his crime but showed moral disgust at his own actions[81] (as opposed to claiming that he "was keeping the child predators away from the children," *id.* at 1186, and portraying himself as a passive recipient of sexual chat and pornographic content, *id.* at 1187).

The Court believes that, given the level of Yang's relative culpability, a heavy but noncustodial sentence is sufficient to impose just punishment and reflect the seriousness of Yang's offense. Indeed, this was an explicit premise of the Commission's 2012 report: that sorting defendants by relative culpability—and imposing below-Guidelines sentences on less culpable defendants—would *promote* the purpose of "just deserts."[82] In the same vein, respect for the law is not enhanced by imposing a custodial sentence out of sheer deference to Guidelines that have been criticized for over a decade as ill-conceived and needlessly severe by the very body that created it. *Cf. Kimbrough*, 552 U.S. at 98 (adhering to

---

[81]   Yang told federal agents that upon buying child pornography, he felt that it was wrong and attempted to delete it from his phone. *Id.*

[82]   2012 Report at 321.

Guidelines that are widely perceived as unjust "fosters disrespect for and lack of confidence in the criminal justice system"). Because Yang falls on the low end of culpability for the crime to which he pleaded guilty, compared to (for instance) the defendant in *Pugh*, Yang should receive a sentence on the low end of the range authorized for that crime—between zero to 20 years in custody, 18 U.S.C. § 2252(b)(2), with any term of supervised release "not less than 5, or life," 18 U.S.C. § 3583(k).

Even then, ten years of supervised release with the first two years on home detention is a heavy sanction. Yang's liberty will be "substantially restrict[ed]" for two years. *Gall*, 552 U.S. at 48. The Eleventh Circuit in *Pugh* indicated that adequate punishment in that case might have been provided by a "lengthy period of home confinement" followed by "long-term supervised release." And any punishment that would have been reasonable in *Pugh* is certainly adequate here.

### 3. The need for special and general deterrence[83]

Yang's sentence adequately promotes *special* deterrence given the Court's finding that he poses a low risk to reoffend. This finding aligns with the unrebutted opinions of Yang's psychologist[84] and his therapist,[85] but is ultimately

---

[83] That is, the need "to deter future criminal activity by the offender and others," respectively. *United States v. Weaver*, 920 F.2d 1570, 1576 (11th Cir. 1991).

[84] ECF 51-1, at 8.

[85] ECF 52, at 1.

a product of the Court's independent assessment of Yang's risk profile: his age; his participation in therapy; his moral recognition; his social support; and the absence of any pathological sexual interest in children, any prior sexual offenses, or any antisocial[86] tendencies.

More difficult to square with Yang's sentence is the need to promote *general* deterrence. Simply put, a custodial sentence is a greater deterrent than a noncustodial one. Yang asserts as an empirical matter that "imposing a lengthier prison sentence on a defendant will not have *any* substantive impact on other citizens' decisions regarding whether to commit crimes," but fails to credibly support that assertion with evidence.[87] And though the Court agrees that "judges

---

[86] "Antisocial," not in the colloquial sense of "unsociable," but in the more technical sense of exhibiting behavior consistent with antisocial personality disorder. *See Antisocial*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/antisocial (last visited Dec. 18, 2024) [https://perma.cc/TU6N-DRBD]. *See infra* at 30–31 (discussing antisocial behavior as a risk factor for sexual dangerousness).

[87] ECF 51, at 29 (emphasis added). Yang's evidence consists of three articles indicating that (1) sentence length is a less effective measure of deterrence than enforcement, *Five Things About Deterrence*, National Institute of Justice (June 5, 2016), https://nij.ojp.gov/topics/articles/five-things-about-deterrence (last visited Dec. 18, 2024); (2) the marginal deterrent effect of longer sentences do not justify their social and economic costs, Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & J. Am. 199, 199-254 (2013); and (3) "it is very difficult to state with any precision how strong a deterrent effect the criminal justice system provides," Kelli D. Tomlinson, *An Examination of Deterrence Theory: Were Do We Stand?*, 80 Fed. Probation J. 33, 33-38 (2016). Such comparative or equivocal statements come nowhere close to proving that longer sentences do not deter criminal conduct *at all*.

should try to be realistic about the incremental deterrent effect of extremely long sentences," *United States v. Craig*, 703 F.3d 1001, 1004 (7th Cir. 2012) (Posner, J., concurring) (emphasis omitted), it also recognizes that, realistically, a sentence of a half-decade in prison acts as a greater deterrent than a sentence imposing no prison time at all. The Court accordingly disavows any notion that the highest level of deterrence here would be achieved by allowing Yang "to remain in the recovery community and be a credible messenger to those who might be tempted to make similar mistakes."[88] Rather, it is the Court's judgment that the risk to general deterrence posed by Yang's sentence is outweighed by the other 3553(a) factors in this particular case.

Reinforcing that judgment is the way in which Yang's sentence promotes *marginal* general deterrence by ensuring that "the harshest sentences [are] reserved for the most culpable behavior." *United States v. Newsom*, 402 F.3d 780, 786 (7th Cir. 2005). As the Commission explained, deterrence is best served in child pornography cases by scaling the severity of the sentence with the offender's relative culpability.[89] It promotes general deterrence, in other words, to leave ample "room" above Yang's sentence to punish more culpable non-production

---

[88]  *Id.* at 28. Yang, without a hint of irony, both empirically questions the deterrent effect of long prison sentences, and baldly asserts with no colorable empirical basis the deterrent effect of his own influence and testimony.

[89]  2012 Report at 321.

child pornography offenders, *id.*: those who preferentially collect violent and abusive images; assiduously organize them and conceal their existence; share them with others in secret online communities; morally justify and encourage the production of child pornography; and commit other sex crimes against children. The Court's sentence here is calculated to be high enough to deter entry-level child pornography offenses like Yang's from occurring at all, yet low enough to deter those offences from escalating into even more destructive conduct.

### 4.    The need to protect the public

Yang's sentence adequately protects the public because he poses a low risk of reoffending, and also because he lacks the traits that the Commission identified as risk factors for sexual dangerousness. The Commission reported that sexually dangerous child pornography offenders are more likely to have committed prior sex crimes, have abused drugs, be diagnosed pedophiles, groom minors, possess large child pornography collections saved to multiple devices, fraternize with other child pornography offenders, and consume non-pornographic content that sexualizes children.[90] Independent of these risk factors, the Commission also identified "nonsexual antisocial behavior"—things like a history of violent offenses, childhood bullying, or "misconduct resulting in expulsion from

---

[90]    *Id.* at 101.

school"—as a key predictor of sexual dangerousness.[91] Yang exhibits none of these risk factors. He does not have a criminal history and does not use drugs.[92] He shows no other signs of "sexual deviancy,"[93] and "no signs of antisocial beliefs or behaviors":[94] he has maintained relationships with family and friends,"[95] has no record of disciplinary issues,[96] and has the capacity for moral reasoning.[97] Yang's risk for future sexual offending is consequently low, and his noncustodial sentence will adequately protect the public.

### 5. The need to provide the defendant with needed educational or vocational training or medical care

Yang's sentence provides him with "tailored and effective" medical treatment that would not be available to him in prison[98]—treatment that Yang has already begun to receive. He is attending therapy for his pornography addiction with an Atlanta-based specialist, participating in both in-person and virtual 12-

---

[91]   *Id.* at 102 & n.170.

[92]   ECF 51-1, at 10.

[93]   *Id.*

[94]   *Id.* at 7.

[95]   *Id.* at 8; *see also* ECF 52, at 2–6 (letters from friends and family).

[96]   ECF 51-1, at 2–3 (Yang "never targeted teachers or caused harm to peers[, ]reported no history of suspension or detentions[, and] "never acted out or required disciplinary action throughout his school years.").

[97]   *Id.* at 8 ("He does not present with lacking empathy, remorse, or shallow emotions consistent with psychopathic characteristics.").

[98]   ECF 51, at 27.

step programs,[99] speaking with accountability partners,[100] and developing a relationship with a mentor.[101] This treatment is necessary for his rehabilitation: Because Yang's child pornography use was mediated by his pornography addiction, he must recover from his addiction before he can safely rejoin society. Yang's treatment is also working: His therapist has reported that Yang has grown to better understand his own behavior, face its damaging consequences, and develop empathy for his victims.[102] Yet despite its importance and efficacy, Yang's treatment would end the moment he went to prison, with no guarantee of a comparable program to take its place. The rehabilitative purpose of punishment is clearly better served by keeping Yang in treatment under a noncustodial sentence.

**6.    The kinds of sentences available**

Yang's sentence is "qualitatively less severe" than any sentence available under the Guidelines, *Gall*, 552 U.S. at 48, which recommend that he serve at least 78 months in prison, *see* U.S.S.G. § 5C1.1(f), and spend a lifetime on supervised release, *see* U.S.S.G. § 5D1.2(b). Nevertheless, Yang's sentence is well within the range established by statute, which does not mandate a term of imprisonment and

---

[99]    ECF 52, at 10–11.

[100]    *Id.* at 1, 8–9.

[101]    *Id.* at 7; ECF 51, at 11.

[102]    ECF 52, at 1.

requires only 5 years of supervised release. 18 U.S.C. § 2252(b)(2). Nor is Yang's sentence particularly close to the statutory minimum, in recognition of the fact that Yang's relative culpability and risk to society, while low, could be lower still. In addition, the Guidelines do contemplate noncustodial sentences for an offender who, like Yang, is young, U.S.S.G. § 5H1.1, receiving needed medical treatment, U.S.S.G. § 5H1.3, and a first-time non-violent offender, U.S.S.G. § 5C1.1 cmt. (n.10).[103] Finally, the Eleventh Circuit in *Pugh* contemplated noncustodial sentences for low-level non-production child pornography offenders. 515 F.3d at 1198–99, 1200 n.14.

### 7.    The Sentencing Guidelines range

Yang's sentence is a significant downward variance from his Guidelines range of 78–96 months in prison—a variance that, as this Opinion explains, is a reasonable exercise of sentencing discretion. Suffice it to say under this factor that the Court, in crafting a reasonable sentence, calculated Yang's Guidelines range, did not assume it to be necessarily reasonable or unreasonable, considered all the

---

[103] Yang does not qualify for an adjustment as a first-time offender because he is a sex offender. U.S.S.G. § 4C1.1(a)(5). Nevertheless, the Court considers the fact that Yang is a first-time non-violent offender relevant to what kind of sentence is reasonable under 3553(a).

3553(a) factors, and weighed policy criticisms of § 2G2.2 in light of the facts of this case. *See Cubero*, 754 F.3d at 900–01.

### 8. Pertinent policy statements of the Sentencing Commission.

Yang's sentence takes the Commission's policy statements on age, mental conditions, and supervised release into consideration, weighing them according to their applicability to the facts of this case. Because Yang's youth and pornography addiction are highly relevant both to his criminal etiology and his risk of recidivism, the Commission's policy statements on age and medical conditions were given significant weight.

The same cannot be said of the policy statement recommending the maximum term of supervised release—which under the current statutory scheme is life—for every child pornography defendant. As the Commission noted in its 2012 report, this policy statement is a holdover from an old statutory scheme under which the maximum term of supervised release for most child pornography defendants was 3 years, and has been criticized as a "blanket recommendation" that ignores difference between offenders "with respect to their levels of risk and corresponding need for lifetime supervision."[104] The Commission indicated its intent "to study whether the guideline should be amended"[105] following a Fifth

---

[104]  2012 Report at 272.

[105]  *Id.* at 291.

34

Circuit decision deeming it reversible error to impose a lifetime of supervised release "without careful consideration of the specific facts and circumstances of the case before it."[106]

In this case, the specific facts and circumstances do not call for a lifetime of supervised release. As *Pugh* observed, Congress authorized lifelong terms of supervised release to address the "high rate of recidivism in convicted sex offenders." 515 F.3d at 1199. Thus, lengthy terms of supervised release may be appropriate for defendants suffering from "deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison." *Id.* But because Yang is a low risk to recidivate and suffers neither from pedophilia nor from child sexual paraphilia, a more modest term of supervised release is appropriate here. The ten years imposed is reasonably calculated to allow full rehabilitation of Yang's pornography addiction and ease his "transition to community life." *United States v. Johnson*, 529 U.S. 53, 59 (2000).

---

[106] *Id.* at 273 (citing *United States v. Alvarado*, 691 F.3d 592, 598 (5th Cir. 2012)); *see also United States v. Fraga*, 704 F.3d 432, 442 (5th Cir. 2013) (vacating sentence imposing a lifetime term of supervised release for defendant who failed to register as a sex offender); *United States v. Kuchler*, 285 F. App'x 866, 870 n.2 (3d Cir. 2008) ("We caution that even when a given term of supervised release term is strongly recommended by the Guidelines, district courts should refrain from imposing that recommended term blindly and without careful consideration of the specific facts and circumstances of the case before it.").

9.    **The need to avoid unwanted sentencing disparities.**

Yang's sentence is consistent with the need to avoid disparities—or, at any rate, as consistent as a sentence under § 2G2.2 can currently be. Nationally, the average child pornography possession defendant received a sentence 25 months below the Guidelines minimum.[107] Over the course of a year, defendants with the exact same Guidelines recommendation as Yang received sentences that varied between 0 and 228 months.[108] Over 4 in 5 of those defendants (81.5%) received a below-Guidelines sentence.[109] The most commonly-imposed sentence in those cases—the statistical mode—was a sentence of probation.[110] In addition, two appellate courts have affirmed the substantive reasonableness of statutory-minimum probationary sentences for non-production child pornography defendants. *United States v. Duhon*, 541 F.3d 391, 399 (5th Cir. 2008) (citing *United States v. Rowan*, 530 F.3d 379, 381 (5th Cir. 2008)); *United States v. Autery*, 555 F.3d 864, 878 (9th Cir. 2009). This is an important development since *Pugh* was decided, at which point—as the Eleventh Circuit stressed—there were no reported cases in which a noncustodial child pornography sentence had survived appellate review.

---

[107]   2021 Report at 22.

[108]   *Id.* at 54.

[109]   *Id.*

[110]   *Id. See also supra* at 6 (noting sentencing disparities under § 2G2.2 in general).

515 F.3d at 1203. The sentencing landscape under § 2G2.2 now is quantitatively and qualitatively different than it was 15 years ago.[111]

That is no less true in this District than it is nationally. Of particular note is *United States v. Galvan*, a recent case in which the government recommended a vastly more lenient sentence under § 2G2.2 for a seemingly more culpable defendant than Yang.[112] *Galvan* involved aggravating factual circumstances not present here—the defendant had viewed child pornography for over half a decade, was storing his collection on multiple devices, and had distributed images to others—all resulting in a higher offense level under the Guidelines.[113] Nevertheless, the government *joined* the defendant in recommending—and the Court imposed—a sentence of 5 years of probation with the first 8 months on home detention.[114] Even in light of the particular mitigating circumstances in Galvan— notably, the fact that defendant was a victim of childhood sexual assault—the Court cannot reconcile the government's recommendation of a noncustodial sentence in Galvan with its recommendation of a 51-month custodial sentence

---

[111] Yang asserts that he has identified 144 cases from around the country in which the court imposed a sentence of "probation, home detention, or marginal custody followed by supervised release," ECF 51, at 31, but does not seem to have filed a list of those cases on the docket.

[112] 1:22-cr-00068-TCB (N.D. Ga. June 15, 2022), ECF 6.

[113] *Id.*

[114] *Id.*

here. In addition to *Galvan*, Yang has identified six cases from this District within the past decade in which the court either imposed a noncustodial sentence under § 2G2.2,[115] or varied downwards from it drastically despite a highly culpable defendant.[116]

In this context, the Court believes that unwarranted sentencing disparities under § 2G2.2 are best mitigated by focusing less on the Guidelines and more on "meticulously consider[ing] the § 3553(a) factors," *Rowan*, 530 F.3d at 381, which it has tried to do here. Those factors indicate that Yang is much less culpable than the average non-production child pornography defendant, and accordingly that a noncustodial sentence here is consistent with both "the need to avoid unwarranted disparities" *and* "the need to avoid unwarranted *similarities* among other[s who are] not similarly situated," *Gall*, 552 U.S. at 55.

### 10. The need to provide restitution to victims.

Because no victims have asked for restitution, this factor played no role in the Court's analysis.

*       *       *

---

[115] ECF 51, at 30 (citing *U.S. v. Fritz*, 4:19-cr-00003-ELR-WEJ-1 (N.D. Ga. Aug. 8, 2019) (imposing a noncustodial sentence of 5 years' probation)).

[116] *Id.* (citing *U.S. v. Wakeman*, 1:16-cr-00303-MHC-1 (N.D. Ga. Dec. 19. 2016) (imposing a sentence of 16 months in custody and 3 years of supervised release on a convicted sex offender on probation who distributed child pornography and chatted with minors)).

Many child pornography sentences involve an uneasy compromise between two truths: that no term of years can reasonably capture the horror intrinsic to even the simplest offense, and that some defendants cannot and should not reasonably bear the full moral weight of that horror themselves. The Court has tried its best here to hold both truths together. Yang's sentence is time served, plus 10 years of supervised release with the first 2 years on home detention.

**SO ORDERED** this 20th day of December, 2024.


Steven D. Grimberg
United States District Judge